**UNITED STATES DISTRICT COURT**
**DISTRICT OF MINNESOTA**

| | |
|---|---|
| United States of America,<br><br>Plaintiff,<br><br>v.<br><br>Marvin Lorenzo Hudson,<br><br>Defendant. | Case No. 25-cr-458-KMM-EMB<br><br>**REPORT AND RECOMMENDATION** |

Defendant Marvin Lorenzo Hudson was charged with attempted robbery of a mail carrier and attempted bribery of a mail carrier. (Indictment (Dkt. No. 1).) Mr. Hudson moves to suppress evidence obtained from a search and seizure. (Def. Mot. (Dkt. No. 33).) I held a hearing on the motion and ordered supplemental briefing (Hr'g Mins. (Dkt. No. 49)), which each party submitted (*see* Def. Supp. Mem. (Dkt. No. 53) & Gov't Supp. Mem., (Dkt. No. 55)).

For the reasons below, I recommend that Mr. Hudson's suppression motion be denied.

## I. Background

### A. Mail carrier incidents

On April 16, 2025, a person approached a mail carrier in Saint Paul and offered him cash to obtain his mail collection-box key. The mail carrier described the person as twenty-six years old, tall, slender, with chin-length dreadlocks. (Gov't Ex. 1 (Dkt. No. 47-1) at 7–9 (¶¶ 5–11).)

The next day, a person approached another mail carrier in the same area and offered him cash for his collection-box key. (*Id.* at 8–9 (¶¶ 7, 11).) The mail carrier described the person as about six feet tall, slender, with shoulder-length dreadlocks or braids. (*Id.* at 9 (¶ 8).) The mail carrier said that the person displayed what seemed to be a semiautomatic handgun and said that he could "take it either way." (*Id.* at 8–9 (¶ 7).) After the carrier offered to obtain a separate key for the person, the suspect wrote a telephone number ending in 5632 on a piece of paper and gave it to the mail carrier. (*Id.* at 8–9 (¶¶ 7, 10–11).)

### B. Warrant application materials

Postal Inspector Justin Patterson submitted an affidavit in support of a warrant to search Mr. Hudson, his home, and his car in connection with these incidents. (*See* Gov't Ex. 1 at 5–46.) Inspector Patterson's affidavit described the incidents, including the mail carriers' descriptions of the person who approached them. His affidavit also included the following information:

- Both mail carriers were shown a photographic array to identify the person who approached them. Both photographic arrays included a four-year-old photo of Mr. Hudson in which he was depicted with short hair. (Gov't Ex. 1 at 10–11 (¶¶ 15–16).) Neither carrier identified Hudson in the photographic arrays. (*Id.* (¶ 16).) Instead, the first carrier selected a photograph with 50 percent certainty, and the second carrier identified another suspect with 85 percent certainty. (*Id.*)
- At the time of the mail-carrier incidents, social-media posts showed Mr. Hudson wearing his hair in shoulder-length braids. (*Id.* (¶¶ 15–16).) Mr. Hudson's height and build matched the mail carriers' descriptions. (*Id.*)
- T-Mobile records showed that the telephone number ending in 5632 had been registered to Mr. Hudson since at least May 2020; Apple records associated the number with an account registered in his name; and Mr. Hudson's probation officer confirmed that she had contacted him through that number. (*Id.* at 9–10, 12 (¶¶ 12–13, 18).) Location records put the phone associated with that number near both mail carriers at the relevant times. (*Id.* at 10 (¶ 14).)

- A forensic examination identified Hudson's fingerprint on the paper bearing the number, and the only identifiable fingerprints on the paper belonged to Hudson and the second carrier. (*Id.* at 12 (¶ 17).)
- In May 2024, Mr. Hudson allegedly obtained an image of another person's payroll check, later possessed a forged check bearing the same account information, deposited the forged check through the other person's telephone, and retained most of the proceeds. (*Id.* at 14–15 (¶¶ 24–27).) The other participant reported communicating with Hudson through the telephone number ending in 5632. (*Id.* at 15 (¶ 27).)
- In March 2025, a credit-union account was opened in Mr. Hudson's name and received a $5,100 transfer on the day it was opened; substantial purchases followed, and a $1,000 money order purchased two days later was used to pay Mr. Hudson's rent. (*Id.* at 12–13 (¶¶ 19–22).)
- Between August 17 and November 27, 2025, public posts from Mr. Hudson's Facebook account sought persons with accounts at particular financial institutions, accounts meeting specified age and transaction-history requirements, identification documents, and transactions involving stated sums of money. (*Id.* at 18–25 (¶¶ 39–55).) Based on his training and experience, Patterson interpreted

the posts as efforts to recruit participants whose accounts could be used to deposit fraudulent checks and withdraw the proceeds. (*Id.*) The most recent post appeared five days before he applied for the warrant. (*Id.* at 24 (¶ 52).)

- Rental, apartment-management, and U.S. Postal Service records showed that Mr. Hudson lived at the location to be searched from March through at least November 2025. (*Id.* at 12, 15–16 (¶¶ 19, 28, 30–32).) Cellular-location records placed the device associated with the number ending in 5632 near the residence through November 28, 2025, including when posts were made from Mr. Hudson's Facebook account on October 30, November 6, and November 27, 2025. (*Id.* at 23–25 (¶¶ 49, 51, 54, 56).)
- Patterson stated that persons engaged in check forgery, wire fraud, and identity theft commonly retain related communications and records on electronic devices carried on their persons or kept in their residences or vehicles, and that participants in fraud schemes often retain such records at their residences for extended periods. (*Id.* at 25, 29 (¶¶ 57, 64).)

### C. Issuance and execution of warrant.

Based on the application materials, I found probable cause to issue the warrant. (Gov't Ex. 1 at 1.) The warrant identified Mr. Hudson, his residence, and his vehicle as the person and property to be searched. (*Id.* at 43.) It authorized the seizure of electronic or digital devices, including cellular telephones, capable of storing information related to, or used to facilitate, the identified offenses. (*Id.* at 44 (¶ 12).) And it authorized biometric procedures to identify or unlock devices reasonably believed to have been used by Mr. Hudson and permitted those devices to be removed for off-site examination. (*Id.* at 45–46.) The warrant required reasonable efforts to avoid searching electronically-stored information not identified in the warrant. (*Id.* at 4 (¶ 1).)

Agents executed the warrant at Mr. Hudson's residence on December 4, 2025, while he and Jashia Givens were present. (Def. Supp. Ex. 1 (Dkt. No. 53-1) at 2–3.) There, agents found a pink purse belonging to Ms. Givens. (Def. Supp. Mem. at 5–6; Gov't Supp. Mem. at 1, 3.) Patterson called Mr. Hudson's known telephone number, heard a phone ringing inside the purse, traced the ringing to a blue iPhone therein, and unsuccessfully attempted to unlock the device through facial recognition. (Def. Supp. Ex. 1 at 2–3.) The Government maintained that the ringing blue iPhone belonged to Mr. Hudson. (*See* Def. Supp. Ex. 1 at 2 (¶ 8); Ex. 2 at 1.) Officers seized a

second telephone that the Government claimed likely wasn't Mr. Hudson's and from which they intended to extract information. (*See* Def. Supp. Ex. 2.) The record does not indicate whether officers completed an extraction or examination of the second telephone.

## II. Discussion

Mr. Hudson moves the Court to suppress all evidence derived from the execution of the December 2, 2025, warrant at his residence. (Def. Mot. at 4.) He argues that the warrant was unsupported by probable cause because neither mail carrier identified him in the photographic arrays, the affidavit relied on stale or ambiguous evidence of earlier financial fraud, and Inspector Patterson's interpretation of Mr. Hudson's social-media posts rested on speculation and conjecture. (*Id.* at 1–4.) Mr. Hudson further argues that agents exceeded the warrant's scope by opening a purse belonging to Jashia Givens, who was a guest at the residence, and seizing and searching the two cellular telephones found inside it. (Def. Supp. Mem. at 2, 5–6.)

I recommend that this Court deny the motion. First, I find there was probable cause to believe Mr. Hudson participated in the two mail-carrier incidents and that evidence would be found at his home and on qualifying electronic devices that was not impermissibly stale. Second, the search of Ms. Givens's purse and the phones within it did not violate Mr. Hudson's

Fourth Amendment rights. Third, the agents relied on the warrant in good faith. Therefore, Hudson's motion to suppress should be denied.

**A. Probable cause The warrant affidavit established probable cause to search Mr. Hudson's residence and qualifying electronic devices.**

Mr. Hudson argues that the warrant was not supported by probable cause because neither mail carrier identified him in the photographic arrays, the evidence concerning prior financial offenses was impermissibly stale or ambiguous, and Inspector Patterson relied on speculation and conjecture to characterize Mr. Hudson's social-media posts as evidence of criminal activity. (Def. Mot. at 1–4.) The Court must also determine whether the affidavit established a sufficient nexus between the evidence sought and Mr. Hudson's residence and electronic devices.

Probable cause to issue a warrant exists when a warrant affidavit establishes a fair probability that evidence of a crime will be found in the place to be searched. *Illinois v. Gates*, 462 U.S. 213, 238 (1983). Probable cause requires a probability or substantial chance of criminal activity, not certainty or proof sufficient to support a conviction. *Id.* at 243 n.13, 246. The issuing judge makes a practical, common-sense determination based on the totality of the circumstances, and a reviewing court asks whether the issuing judge had a substantial basis for that determination. *Id.* at 236, 238–39. The issuing judge considers the affidavit as a whole rather than examining each

fact in isolation. *United States v. Mims*, 122 F.4th 1021, 1031–32 (8th Cir. 2024). The issuing judge also may account for an officer's training and experience when evaluating conduct that may appear innocent or ambiguous to a layperson. *United States v. Wallraff*, 705 F.2d 980, 988 (8th Cir. 1983).

Here, Mr. Hudson argues there was no probable cause because neither mail carrier identified his photo in the photographic arrays. (Def. Mot. at 2.)

The first carrier had described the suspect as having chin-length dreadlocks. (Gov't Ex. 1 at 7 (¶ 6).) The second carrier described the suspect as having shoulder-length hair worn in dreadlocks or braids. (*Id.* at 9, ¶ 8.) Consistent with these descriptions, both carriers selected photographs of individuals with dreadlocks. (*Id.* at 10–11 (¶ 16).) Neither of the individuals depicted in those photographs was Mr. Hudson. (*Id.*) The photograph of Mr. Hudson used in the arrays depicted him with short hair. (*Id.*) That photograph was approximately four years old. (*Id.*)

But Mr. Hudson's social-media account around the time of the incidents showed him wearing braids extending to his shoulders. (*Id.*) Thus, Mr. Hudson's contemporaneous hairstyle generally matched the carriers' descriptions, while the hairstyle shown in the array photograph did not.

Because more recent photos of Mr. Hudson's matched the descriptions and the older photo did not, I reasonably concluded upon reviewing the warrant application materials that the outdated photograph and material

difference in hairstyle explained the carriers' failure to identify Mr. Hudson in the arrays. I therefore considered the nonidentifications without treating them as dispositive. *See Gates*, 462 U.S. 213, 238 (1983) (instructing the issuing judge to make a "practical, common-sense decision" based on all the circumstances), 243 n.13 (explaining that probable cause requires a probability or substantial chance of criminal activity, not an actual showing).

Moreover, the photo array was unnecessary since independent evidence linked Mr. Hudson to the two mail-carrier incidents. The telephone number supplied during the second incident was associated with Mr. Hudson, location records placed the corresponding device near both incidents, and Mr. Hudson's fingerprint was found on the paper bearing the number. (Gov't Ex. 1 at 9–10, 12 (¶¶ 10, 12–14, 17–18).) In light of that evidence and the similarity and temporal and geographic proximity of the incidents, the affidavit established a fair probability that Mr. Hudson was involved notwithstanding the photographic-array results. *See Gates*, 462 U.S. at 245–46 (explaining that corroboration through independent sources may provide a substantial basis for probable cause and that "corroboration of major portions" of the underlying account can establish the required fair probability).

Mr. Hudson next argues that Inspector Patterson relied on speculation and conjecture to transform ambiguous social-media posts into evidence of criminal activity. (Def. Mot. at 3–4.) Patterson's affidavit described a series of social-media posts on profiles linked with Mr. Hudson, which sought persons with accounts at particular financial institutions, accounts meeting specified age and transaction-history requirements, identification documents, and transactions involving specified sums of money. (Gov't Ex. 1 at 18–25 (¶¶ 40–55).) Patterson did more than characterize these posts as suspicious. He explained, based on his training and experience, why the posts' details were significant: people engaged in check fraud may recruit third parties with accounts at the financial institution on which a stolen check is drawn, seek established accounts to avoid fraud controls or delays in the availability of funds, and use those accounts to deposit fraudulent checks and withdraw the proceeds. (*Id.* (¶¶ 41–46, 53, 55).)

Patterson's interpretation of the social-media posts was supported by the other information in the affidavit. The alleged May 2024 incident involved the use of another person's telephone and bank account to deposit a forged check and withdraw the proceeds. (*Id.* at 14–15 (¶¶ 24–27).) The affidavit also described a transfer into a newly opened credit-union account in Mr. Hudson's name in March 2025, followed by purchases and a money order used to pay his rent. (*Id.* at 12–13 (¶¶ 19–22).)

Viewed in this context, I reasonably credited Patterson's interpretation of the social-media posts without concluding that every post independently established criminal conduct. *See Mims*, 122 F.4th at 1031–32 (giving weight to officer's interpretation of apparently innocuous communications based on officer's training, experience, prior investigative work, and the context of the communications); *Wallraff*, 705 F.2d 988 (explaining that conduct appearing innocuous to a layperson may be significant to an officer with relevant training and experience). Probable cause requires only a fair probability of criminal activity based on the totality of the circumstances, not certainty that Patterson's interpretation was correct. *See Gates*, 462 U.S. at 238. Here, the posts contribute to the circumstances I considered in determining there was probable cause to search Mr. Hudson's home and electronic devices.

Third, Mr. Hudson argues that the financial evidence in the warrant-application materials was impermissibly stale. Whether information has become stale depends on the circumstances, including "the lapse of time," "the nature of the criminal activity," and "the kind of property subject to the search." *United States v. Colbert*, 828 F.3d 718, 727 (8th Cir. 2016) (quoting *United States v. Gibson*, 123 F.3d 1121, 1124 (8th Cir. 1997)).

The May 2024 check-fraud allegation could be considered stale and carry less weight *if* viewed as an isolated transaction. But the affidavit did not present that incident in isolation. It described additional suspicious

financial activity in March 2025 and a series of Facebook posts between August and November 2025 that Patterson interpreted as efforts to recruit persons whose bank accounts could be used in financial-fraud schemes. (Gov't Ex. 1 at 12–15, 18–25 (¶¶ 19–27, 40–55).) The posts repeatedly referred to particular financial institutions, account qualifications, identification documents, and specified sums of money, and the most recent post appeared on November 27, 2025—five days before Patterson applied for the warrant. (*Id.* at 18–25 (¶¶ 40–55).) Taken together, these allegations led me to view the earlier incident as part of a continuing or recurring course of suspected conduct rather than as a completed offense with no connection to the circumstances existing when the warrant issued. *See Colbert*, 828 F.3d at 727 (holding information was not stale when the affidavit established an ongoing criminal enterprise and described relevant activity occurring shortly before issuance of the warrant).

The nature of the evidence sought also supported issuing the warrant. Patterson sought a warrant to get financial records, communications, identifying information, and electronically-stored evidence concerning the suspected offenses. He averred that people engaged in check forgery, wire fraud, and identity theft commonly retain related communications and records on cellular telephones carried on their persons or kept in their homes or vehicles. (Gov't Ex. 1 at 25 (¶ 57).) He further stated that participants in

fraud schemes may retain records concerning victims, communications with coconspirators, and the disposition of proceeds in hard-copy or digital form for long periods, often at their residences. (*Id.* at 29 (¶ 64).) I was entitled to consider these statements based on Patterson's training and experience. *See Wallraff*, 705 F.2d at 988.

Because the affidavit described suspected activity continuing until five days before Patterson applied for the warrant and sought the type of records reasonably expected to be retained, the time between the May 2024 check-fraud incident and the April 2025 mail-carrier incidents did not dissipate probable cause. Considering the affidavit as a whole, I had a substantial basis to find that the alleged financial activity was ongoing and that evidence of it was likely to be found when the warrant issued. *See Gates*, 462 U.S. at 238–39; *Colbert*, 828 F.3d at 727.

Finally, Mr. Hudson argues that there was no nexus between the evidence sought and the items to be searched. *See Colbert*, 828 F.3d at 726 (requiring nexus). The required nexus depends on the nature of the suspected offense and the reasonable, logical likelihood that useful evidence will be found at the location. *Id.* The nexus may rest on reasonable inferences drawn from the nature of the offense and the facts stated in the affidavit. *See id.* at 726–27.

Here, the affidavit established the required nexus to Mr. Hudson's residence and electronic devices. Rental, management, and postal records showed that Hudson lived at the residence. (Gov't Ex. 1 at 12, 15–16 (¶¶ 19, 28, 30–32).) Cellular-location records repeatedly placed the device associated with his known number there, including when several recent Facebook posts were made. (*Id.* at 23–25 (¶¶ 49, 51, 56).) Patterson also explained that people involved in the suspected offenses commonly retain related records on electronic devices and at their residences. (*Id.* at 25, 29 (¶¶ 57, 64).) These facts supplied a particularized basis to believe that evidence would be found at Mr. Hudson's residence and on qualifying electronic devices. *See Gates*, 462 U.S. at 238–39; *Colbert*, 828 F.3d at 726–27.

Considering the warrant application materials as a whole, I had a substantial basis to find a fair probability that Mr. Hudson was involved in the suspected offenses, that the alleged financial activity was ongoing rather than stale, and that evidence would be found at his residence and on qualifying electronic devices. The warrant was supported by probable cause, and Mr. Hudson's facial challenge should be rejected.

**B. The seizure and examination of the phones found in Ms. Givens's purse did not violate Mr. Hudson's Fourth Amendment rights**.

There is no dispute that the December 2, 2025, warrant authorized officers to search and seize electronic devices found in Mr. Hudson's home. (*See* Gov't Ex. 1 at 44–46.) Indeed, Mr. Hudson's supplemental briefing substantially confirms this. (*See* Def. Supp. Br. at 7 n.3 (recognizing that officers did not need an additional "warrant to search the cell phone they believed to be linked to Hudson because the December 2 warrant arguably gave them permission to execute that type of search.") This complies with the Supreme Court's general directive to "get a warrant" before searching smart phones. *Riley v. California*, 573 U.S. 373, 403 (2014).

Mr. Hudson instead focuses his challenge on the fact that the electronic devices seized were contained in Ms. Givens's purse, which officers found in his home. Mr. Hudson argues that by looking inside Ms. Givens's purse, officers impermissibly "exceeded the scope of the search warrant." (Def. Mot. at 1.) As a result, he argues, the seizure of the two phones found in the purse and extraction of data from them were not "permitted" and should be suppressed. (Def. Supp. Br. at 5–6.)

Mr. Hudson is correct that officers did not have a separate warrant to search Ms. Givens's purse. He is incorrect in arguing that they needed one.

The search warrant authorized officers to search the premises in order to seize electronic devices. (Gov't Ex. 1 at 45–46.) Ms. Givens's purse was in the premises, not on her person, and reasonably could be believed to contain electronic devices. Thus, the warrant permitted officers to search the purse for electronic devices.[1]

To the extent that Mr. Hudson argues that the officers' search violated *Ms. Givens's* privacy interest in her purse or the phones it contained (*see id.* at 6–7), he lacks standing to make this argument on her behalf. *See United States v. Gomez*, 16 F.3d 254, 256 (8th Cir. 1994) (Fourth Amendment rights are personal and may not be asserted vicariously, and a defendant seeking suppression bears the burden of establishing that the challenged search or seizure invaded his own protected interest); *United States v. Thomas*, 97 F.4th 1139, 1143–44 (8th Cir. 2024).

---

[1] Although more probable cause was not needed, I note that officers called the phone number that Mr. Hudson had provided to the second mail carrier and that officers linked to other activity relevant to the case. Upon calling this number, officers heard it ring in Ms. Givens's purse. As Mr. Hudson acknowledges, "based on the ringing cell phone, police may have reasonably believed the purse contained contraband or evidence of a crime." (Def. Supp. Br. at 6.)

Mr. Hudson's reliance on *United States v. Simmermaker*, 998 F.3d 1008 (8th Cir. 2021), is misplaced. (*See* Def. Supp. Br. at 6.) There, the defendant had been a visitor in a home that officers searched pursuant to a warrant; she moved to suppress evidence they seized from a locked container in the home that belonged to her. *Id.* at 1009. The court held that the defendant-visitor possessed an independent privacy interest in personal effects found during execution of a premises warrant. *Id.* at 1009–10. *Simmermaker* is not analogous to this case, since Ms. Givens (the visitor in our scenario) is not a defendant mounting a Fourth Amendment challenge in this case.

Mr. Hudson claims that the second telephone was "likely" unrelated to him, but this doesn't alter that analysis. (Def. Supp. Br. at 5.) The scope of the warrant was broad, permitting officers to search Mr. Hudson's "one-bedroom apartment" and to seize "*any* electronic or digital device" found in it. (Gov't Ex. 1 at 43, 44 (emphasis added).) Because the purse was in the one-bedroom apartment and officers reasonably identified it as possibly containing the electronic devices they were authorized to seize, the officers' search of the purse did not violate Mr. Hudson's Fourth Amendment rights, and the subsequent seizure of the phones within the purse were thus not poisoned fruit of any unlawful search. The motion to suppress evidence obtained from the two telephones should therefore be denied.

**C. Alternatively, the good-faith exception applies.**

Finally, even if the warrant was not supported by probable cause, suppression is not warranted because the officers reasonably relied on it in objective good faith.

Evidence obtained by officers acting in objectively reasonable reliance on a warrant issued by a detached and neutral judge ordinarily is not excluded when the warrant is later determined to lack probable cause. *United States v. Leon*, 468 U.S. 897, 922–23 (1984). The inquiry is whether a reasonably well-trained officer would have known that the search was unlawful despite the issuing judge's authorization. *United States v. Norey*, 31 F.4th 631, 635–36 (8th Cir. 2022). Courts making that determination considers the totality of the circumstances, including information known to the officer but not presented to the issuing judge. *Id.* at 636.

An officer's reliance on a warrant is not objectively reasonable when: (1) the issuing judge was misled by information the affiant knew was false or would have known was false but for reckless disregard of the truth; (2) the issuing judge wholly abandoned the neutral judicial role; (3) the supporting affidavit was so lacking in indicia of probable cause that official belief in the existence of probable cause was entirely unreasonable; or (4) the warrant was so facially deficient that the executing officers could not reasonably presume it valid. *Leon*, 468 U.S. at 923.

The first two *Leon* circumstances do not apply. Mr. Hudson challenges the weight and legal sufficiency of the affidavit; he doesn't contend that Patterson knowingly or recklessly misled me or that I abandoned my neutral judicial role. (Def. Mot. at 1–4; Def. Supp. Mem., at 1–2.) Moreover, the affidavit disclosed the unfavorable photographic-array results rather than concealing them. (Gov't Ex. 1 at 11 (¶ 16).)

Nor was the affidavit so lacking in indicia of probable cause that reliance on it was entirely unreasonable. This exception applies when an affidavit offers only conclusory assertions and lacks sufficient facts for the issuing judge to make an independent probable-cause determination. *See Norey*, 31 F.4th at 636–37. Here, the affidavit connected Mr. Hudson to the mail-carrier incidents through the supplied telephone number, location information, and fingerprint evidence. (Gov't Ex. 1 at 9–12 (¶¶ 10, 12–14, 17–18).) It also described suspected financial activity, recent social-media posts, and facts linking Mr. Hudson and the associated device to the residence. (*Id*. at 12–16, 18–29 (¶¶ 19–32, 40–64).) Those concrete facts permitted me to evaluate probable cause independently. The affidavit therefore was not "bare bones," even if reasonable minds could dispute whether its allegations ultimately established probable cause. *See Leon*, 468 U.S. at 926; *Norey*, 31 F.4th at 636–37.

The warrant also was not facially deficient. *Leon* identifies this exception when a warrant fails to particularize the place to be searched or the things to be seized, such that executing officers cannot reasonably presume it valid. 468 U.S. at 923. This warrant identified Mr. Hudson's person, residence, and vehicle as the subjects of the search and specified the categories of evidence and electronic devices subject to seizure and examination. (Gov't Ex. 1 at 43–46.) It also defined the authorized biometric procedures and limited the examination of electronically stored information to evidence identified in the warrant. (*Id.* at 4, 45–46.) Because the warrant particularized both the places to be searched and the items to be seized, officers could reasonably presume it valid. *See Leon*, 468 U.S. at 923.

Accordingly, even if the affidavit did not establish probable cause, the officers' reliance on the warrant was objectively reasonable and the good-faith exception would independently preclude suppression. *See Leon*, 468 U.S. at 922–23; *Norey*, 31 F.4th at 635–37.

## III. Recommendation

For the foregoing reasons, and upon careful consideration of the entire record, IT IS HEREBY RECOMMENDED that: that Defendant Marvin Lorenzo Hudson's Motion to Suppress Evidence Seized from a Search and Seizure (Dkt. No. 33) be **DENIED**.

Date: August 7, 2026

*s/Elsa M. Bullard*
Elsa M. Bullard
United States Magistrate Judge

## NOTICE

**Filing Objections:** This Report and Recommendation is not an order or judgment of the District Court and is therefore not appealable directly to the Eighth Circuit Court of Appeals. Under D. Minn. LR 72.2(b)(1), "[a] party may file and serve specific written objections to a magistrate judge's proposed findings and recommendations within 14 days after being served with a copy of the recommended disposition, *unless the court sets a different deadline*." (Emphasis added.) The Court modifies the deadline such that objections are due on or before May 4, 2026. Responses to objections are due on or before May 7, 2026. All objections and responses must comply with the word or line limits set forth in Local Rule 72.2(c).